# Exhibit A

**From:** Jane Lemley <jlemley@harrison-johnston.com>
**Sent:** Saturday, September 7, 2024 9:07 AM
**To:** Schneider, Jeremy S. (DC) <Jeremy.Schneider@jacksonlewis.com>
**Cc:** White, Sherry <swhite@harrison-johnston.com>
**Subject:** Fogel v. NRA -- Civil Case No. 2024 12750
**Importance:** High


Good morning, Jeremy:

I am attaching a courtesy copy of the Complaint in the above referenced action that was filed yesterday afternoon.  I have also included a copy of the civil cover sheet and date-stamped first page of the Complaint.  I'm also including the four exhibits as separate documents; personal info was redacted from the documents filed with the complaint.

We will be serving the registered agent once the summons/service copy is ready.

I am happy to discuss this matter with you in the near future if your client would like to explore reaching an amicable resolution of this dispute.


Jane




JANE E. LEMLEY
MEMBER

21 S. Loudoun Street
Winchester, VA 22601
(540) 667-1266 ext 124
(540) 667-1312 fax
**(703) 328-5280 mobile**
www.harrison-johnston.com
Pronouns: she, her, herself


*Solving Your Workplace Problems*





PRIVACY STATEMENT:

This message and attachments are confidential and are intended only for the addressee(s). This message may contain information that is protected by one or more legally recognized privileges. If the reader of this message is not the intended recipient or an authorized representative of the intended recipient, it is not intended that any legal privilege or the confidentiality of the messages and attachments are waived, and the same are hereby not waived. If you receive this communication in error, please notify the sender immediately by return e-mail and delete this message from your computer and network without reading or saving them in any manner. The unauthorized use dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful.

DISCLOSURE UNDER TREASURY CIRCULAR 230: The United States Federal tax advice, if any, contained in this document and its attachments may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties.

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

APRYL MARIE FOGEL,

       *Plaintiff,*

*v.*                                  Civil Action Case No. _____

THE NATIONAL RIFLE ASSOCIATION    **A JURY TRIAL IS DEMANDED**
OF AMERICA, INC.,

SERVE
CORPORATION SERVICE COMPANY
100 Shockoe Slip Fl 2,
Richmond, VA, 23219 – 4100

       *Defendant.*

## COMPLAINT

    ***COMES NOW,*** the Plaintiff, Apryl Marie Fogel ("Plaintiff" and "Ms. Fogel"), by and

through her counsel, HARRISON & JOHNSTON, PLC, Stephen L. Pettler, Jr., Jane E. Lemley,

and Robert J. Sproul, and in support of her Complaint against the Defendant, the National Rifle

Association of America, Inc. ("Defendant" and the "NRA"), seeks damages for violation of

Virginia's Whistleblower Protection Law (the "VWPL"), states as follows:

**A. PARTIES**

    1.     Apryl Marie Fogel is a resident of Birmingham, Alabama. Birmingham, Alabama 35213.

    2.     The NRA is a nonstock, charitable and tax-exempt corporation, organized

under the laws of New York.

    3.     The NRA's headquarters (hereinafter "NRA Headquarters") is located at 11250

Waples Mill Road, Fairfax, Virginia 22030.

4.     The NRA is registered to do business in the Commonwealth of Virginia.

**B. JURISDICTION AND VENUE**

5.      This Court has jurisdiction over the subject matter of this action under VA. CODE § 17.1-513.

6.     This Court has personal jurisdiction over the NRA under VA. CODE § 8.01-328.1(1) because it transacts business in the Commonwealth of Virginia.

7.     Venue is proper in this Court pursuant to VA. CODE § 8.01-262(1) because the NRA conducts business in Fairfax, Virginia.

8.     Venue is proper in this Court pursuant to VA. CODE § 8.01-262.1(4) because all or some of the events complained of occurred in Fairfax County, Virginia.  Further, the Parties agreed in writing signed by both Parties that Virgina law applies to all disputes relating to Ms. Fogel's employment and that venue shall lie in Virginia.

**C. PRELIMINARY STATEMENT**

9.     Apryl Marie Fogel began working with the NRA in March 2023.

10.    Ms. Fogel is a lifetime endowment member and was an NRA-Political Victory Fund endorsed candidate and previous NRA Institute of Legislative Action (the "NRA-ILA") campaign field representative who has long been committed to the values and mission of the NRA.

11.    As a long-standing defender of the Second Amendment's protection of the right to bear arms, Ms. Fogel perceived that her new position as Director of the Women's Leadership Foundation ("WLF") in the NRA's Office of Advancement was a "dream job."

12.    Like other NRA members, Ms. Fogel believed that the NRA was under attack by the left, and she viewed New York Attorney General Letitia James' civil action, filed in August of 2020 against Wayne LaPierre and three (3) other members of the NRA leadership for, among other things,

financial mismanagement and self-dealing (hereinafter, the "New York Trial")[1] as yet another effort by liberals to destroy the organization.

13.     When she began working at the NRA's Office of Advancement in Fairfax, Virginia, Ms. Fogel, who had experience working for highly regulated, tax exempt charitable organizations, believed that she would join her colleagues, including her supervisors, Tyler Schropp and Board Member and WLF Co-Chair and NRA Board Member Janet Nyce, in showing that the NRA and its leadership did not, as was alleged in the New York Trial, engage in any financial mismanagement or self-dealing.

14.     Within a short time after commencing her employment, however, she discovered that Janet Nyce was violating NRA policy and applicable law by freely using expensive black car services and demanding that the WLF pay for a contractor to perform the services that Ms. Fogel and her staff could accomplish less expensively. Ms. Fogel also discovered that this same contractor's shared file created a serious security threat. Finally, and more importantly, Ms. Fogel realized that her predecessors had failed to establish and maintain sound record-keeping practices with respect to, among other things, the names of donors, the amount of their donations, and the costs of fundraising expenses. Ms. Fogel realized that the NRA was, therefore, not complying with federal and state financial management and financial disclosure requirements.

15.     Ms. Fogel repeatedly and increasingly reported her concerns to Tyler Schropp and Janet Nyce, as well as WLF Co-Chair Jane Brown, WLF Co-Founder and former Co-Chair Susan LaPierre, and Milissa Coder to no avail.

16.     These individuals and others retaliated against Ms. Fogel for whistleblowing by creating a toxic work environment, excluding her from key WLF leadership meetings, extending her

---

[1] Case Name: *People of the State of New York, by Letitia James, Attorney General of The State of New York v. The National Rifle Association of America, Inc., Wayne LaPierre, Wilson Phillips, John Frazer, and Joshua Powell.*  Case No.: 451625/2020

ninety-day probation period, and, ultimately, terminating her employment, effective October 2, 2023.

17.     It was only after the New York Trial began in January 2024 that Ms. Fogel realized that Tyler Schropp – the supervisor to whom she complained the most – was at the heart of the NRA's financial mismanagement and self-dealing at issue in said trial.

18.     Now that both phases of the New York Trial are over, and the named wrongdoers have been held accountable for their wrongdoing (see Section H, Below), Ms. Fogel is coming forward to hold the NRA accountable for violating her rights under Virginia's Whistleblower Protection Law.

## D.  THE NRA AND APPLICABLE LAW

19.     The NRA has operated as a New York not-for-profit charitable membership organization, chartered by a special act of the State of New York Legislature in 1871. The NRA is exempt from taxation by New York law and federal law.

20.     The modern-day NRA is widely recognized as the largest and most powerful gun rights organization in the United States and the foremost defender of Second Amendment rights.  It is estimated to have five (5) million members.

21.     The NRA is headquartered in Fairfax, Virginia, but has been legally domiciled in New York since its inception.

22.     The NRA has an office in New York located at 28 Liberty Street, New York, New York, 10005.

23.     The NRA Foundation, Inc., ("NRA Foundation") was established in 1990 to raise tax deductible contributions in support of a wide range of firearm-related public interest activities of the National Rifle Association of America and other organizations that defend and foster the Second Amendment rights of all law-abiding Americans.  Its principal office is also located in Fairfax, Virginia, at the same address as the NRA's headquarters.

24. The Women's Leadership Foundation Endowment is one of several endowments within the NRA Foundation to which individuals may make donations to further the NRA's mission.

25. The NRA and the NRA Foundation are financially interrelated entities because the NRA is able to influence the Foundation's operating and financial decisions and because the NRA has an ongoing economic interest in the net assets of the Foundation.

26. The NRA and the NRA Foundation are tax-exempt charitable institutions under both federal and state law. As such, they are both highly regulated by state law and federal law.

27. Because the NRA has been legally domiciled in New York since its inception, the governance of its internal affairs is subject to New York law. New York law sets forth the duties and powers of the NRA as a charitable not-for-profit corporation, and the duties, powers, and liabilities of the NRA's officers, directors, key persons, and members.

28. The New York Not-for-Profit Corporation law, NY Not for Profit Corp L § 201 *et seq* (2021) (the "N-PCL"), the New York Estate Powers and Trust Law, (the "EPTL"), and the Executive Law (the "Exec. Law") govern the NRA and its use of its assets and institutional funds, and the fiduciary duties of its officers and directors with respect to those assets and institutional funds. The N-PCL generally governs the governance and fiduciary duties of the NRA's officers and directors. The EPTL generally governs the oversight of the NRA's charitable assets. The Executive law generally governs the NRA's fundraising activities.

29. Pursuant to N-PCL § § 701, 713 and 714, a non-for-profit corporation "shall be managed by its board of directors," which has the power to elect officers and remove them, with or without cause.

30. Pursuant to N-PCL § 717(a), directors, officers and key persons of not-for-profit entities

such as the NRA are required to "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

31.     In addition, N-PCL § 552 requires directors and officers of a not-for-profit corporation, such as the NRA, to act with undivided loyalty to the corporation in the management and investment of the institutional funds of the corporation.

32.     Under N-PCL § 720, directors, officers, or key persons may be compelled to explain or be liable for the "neglect of, or failure to preform, or other violations of [ ] duties in the management and disposition of corporate assets committed to his charge" or "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

33.     A member of the NRA's Board of Directors is subject to N-PCL § 720.

34.     Under N-PCL § 515(a), the NRA may only pay "compensation in a reasonable amount" to officers, directors, or members for services actually rendered.

35.     Under N-PCL § 515(a), the NRA is barred by law from paying dividends and from distributing "any part of its income or profit to its members, directors, or officers."  Under N-PCL § 112(a)(1) and 1101(a)(2), the NRA could be annulled or dissolved for paying dividends and/or distributions prohibited by law. Article 5-a of the N-PCL, New York Prudent Management of Institutional Funds Act (NYPMIFA) establishes the standard of conduct for managing and investing institutional funds.  The NRA is an "institution," as that term is used in NYMIFA, which holds and manages "institutional funds," as that term is used in NYPMIFA. N-PCL § 551(d) & (e) and, therefore, must adhere to NYPMIFA's standards for managing and investing institutional funds.

36.     Under NYPMIFA, the obligations of the NRA are also imposed upon the Board of Directors of the NRA.

37.     In accordance with NYPMIFA, when managing and investing institutional funds, the

NRA, through its directors and officers, (a) must, subject to the intent of a donor expressed in a gift instrument, consider the purposes of the NRA and the purposes of its institutional funds; and (b) shall manage institutional funds "in good faith and with care an ordinarily prudent person in a like position would exercise under similar circumstances." N-PCL § 552. Each person responsible for the management of institutional funds also has a duty of loyalty to the mission of the corporation, imposed by law. *Id.*

38.     In managing institutional funds under NYPMIFA, the NRA and the governing Board of Directors must make a reasonable effort to verify facts relevant to the management of the funds.

39.     The "institutional funds" of the NRA include investments, cash balances, funds derived from pledging NRA assets or credit, income derived from rents to third parties, and funds held by or paid out to vendors. "Institutional funds" also include funds in the hands of third parties in which the NRA has a valid claim, such as improper payments of personal expenses, funds diverted from the NRA, and funds paid *ultra vires.*

40.     The NRA is exempt from federal taxation pursuant to Section 501(c)(4) of the Internal Revenue Code because it was ". . . not organized for profit but operate[s] exclusively for the promotion of social welfare . . . and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes." 26 U.S.C § 501(c)(4).

41.     As a 501(c)(4) organization, the NRA cannot be organized for profit; must be operated exclusively or primarily to further the common good and general welfare of the community; and cannot permit its income to inure to the benefit of any private individual.  *Id.*

42.     As a 501(c)(4) organization under the Internal Revenue Code, the NRA must Annually file Form 990 with the IRS, through which it must disclose, among other things, its revenue, and expenses for each taxable year.  *Id.*

43.     The NRA must also disclose to the IRS on Schedule B to Form 990 the amount of

donations received and the name and address of each donor, but the NRA is not required by federal law to *publicly* disclose the names and addresses of its donors. *Id.* Similarly, the NRA must annually submit Schedule B to Form 990 to the New York Attorney Generally, but it is not required to publicly disclose the names and address of its donors.

44.     Because the NRA is *not required* to disclose the names and addresses of its members, the NRA protects from disclosure the names and addresses of its members through internal security policies and procedures.

45.     The NRA Foundation, which was established in 1990, is a 501(c)(3) tax-exempt organization under the IRS Tax Code. It raises tax-deductible contributions in support of a wide range of firearm-related public interest activities of the National Rifle Association of America and other organizations that defend and foster the Second Amendment rights of all law-abiding Americans. It may not engage in lobbying efforts. 26 U.S.C § 501(c)(3).

46.     As a 501(c)(3) organization under the Internal Revenue Code, the NRA Foundation must also annually file a Form 990 with the IRS, through which it must state, among other things, the amount it spends on fundraising activities each year. *Id.*

47.     The NRA Foundation must also disclose to the IRS on Schedule B to Form 990 the amount of donations received and the name and address of the donor, but the NRA is not required to *publicly* disclose the names and addresses of its donors. *Id.*

48.     Similarly, the NRA Foundation must annually submit Schedule B to Form 990 to the New York Attorney Generally, but it is not required to *publicly* disclose the names and addresses of its donors, and the NRA carefully protects the privacy of its donors through internal policies and procedures.

49.     NRA policy permits employees to use taxis and Ubers. Employees may not use other forms of ground transportation without prior approval. NRA policy also requires NRA employees

to follow applicable law and regulation with respect to financial management, including reporting requirements, with respect to all donated funds. NRA policy also prohibiting utilizing a contractor for work that can be performed by NRA staff.

50.     The NRA and its Board of Directors are also legally required by New York law to adopt, oversee, and ensure compliance with a policy that effectively protects whistleblowers.  N-PCL § 715-b; EPTL § 8-1.9.  The policy must ensure, among other things, that no employee who in good faith reports unlawful conduct by the corporation or conduct that violates a corporate policy suffers intimidation, harassment, discrimination, or other retaliation. *Id.*

51.     The Virginia Whistleblower Protection Law prohibits employers from discharging, disciplining, threatening, discriminating against, or penalizing an employee, or from taking other retaliatory action with respect to the employee's compensation, terms, conditions, location, or privileges of employment, because, among other things, "the employee . . .  reports in good faith a violation of any federal or state law or regulation to a supervisor.  VA Code § 40.1-27.3.

## E. THE NRA'S ORGANIZATIONAL STRUCTURE

52.     The NRA is comprised of several divisions. The NRA divisions are: (a) Membership; (b) Affinity and Licensing Programs; (c) Information Services; (d) Publications; (e) Public Affairs; (f) Advancement; (g) Office of the Treasurer; (h) The NRA-ILA; (i) General Operations; (j) Office of General Counsel, and (k) Human Recourses.

53.     Wayne LaPierre, the NRA's Chief Executive Officer and Executive Vice President from 2001 to 2024, oversaw the administration of these divisions.

54.     Wayne LaPierre reported to the NRA's Board of Directors.

## F. TYLER SCHROPP AND THE NRA'S OFFICE OF ADVANCEMENT

55.     The NRA's Office of Advancement manages the NRA's sophisticated and diverse

fundraising operations.

56. The NRA's Office of Advancement is located at the NRA Headquarters in Fairfax, Virginia.

57. In or around 2009, Mr. Schropp joined the NRA as the Director of the NRA's Office of Advancement at Wayne LaPierre's request.

58. While Plaintiff was employed by the NRA and at all times relevant to this Complaint, Mr. Schropp was a "key person" within the meaning of

NCPL § 102 (a)(25).

59. Mr. LaPierre first met Tyler Schropp when Mr. Schropp was employed by the public relations firm, Ackerman McQueen.

60. The NRA was one of Ackerman McQueen's most important clients. Ackerman McQueen served the NRA for nearly forty years.

61. Mr. Schropp was employed by Ackerman McQueen from 1993 until 2001. While at Ackerman McQueen, Mr. Schropp's primary duty was to be a close liaison with Wayne LaPierre.

62. In or around 2001, Mr. Schropp began working as Senior Vice President for the Mercury Group, which was a wholly owned subsidiary of Ackerman McQueen that specializes in crisis public relations.

63. While at the Mercury Group, Mr. Schropp's primary client was the National Rifle Association.

64. As a result of working at Ackerman McQueen and then at the Mercury Group, Mr. Schropp became close personal friends with Wayne LaPierre.

65. In or around 2009, Ackerman McQueen and the NRA hatched a scheme according to which Ackerman McQueen issued an American Express card to Tyler Schropp, as the new head of the fledgling NRA Office of Advancement, to pay for, among other things, luxury hotels and limousine

services for Wayne LaPierre. Ackerman McQueen agreed to cover the charges and then bill them back to the NRA concealed by ambiguous descriptions, thereby avoiding the NRA's internal controls meant to prohibit abuse of the NRA's funds for personal gain and self-dealing. Tyler Schropp implemented and perpetuated this unlawful scheme without detection for nearly fifteen years.

## G. THE OFFICE OF ADVANCEMENT AND THE WOMEN'S LEADERSHIP FORUM

66.     The WLF was formed to create a community of women within the NRA with a shared commitment to the Second Amendment right to bear arms and a desire to support NRA's mission through philanthropy and advocacy.

67.     The WLF is now one of the NRA's largest fundraising arms and most influential philanthropic groups within the NRA.

68.     The Director of the WLF is employed by the NRA and reports to the Executive Director of the Office of Advancement and to the Co-Chairs of the WLF. The Director maintains an office at the NRA's headquarters in Fairfax, Virginia, and works from there as well as remotely from home.  The Director of the WLF supervises a program manager, contractors, and volunteers, and coordinates with other Office of Advancement staff.

69.     The Director of the WLF works with the WLF Leadership Council and manages the day-to-day operations of the WLF, prepares and oversees the WLF's annual budget, raises funds for the WLF, plans, markets, and coordinates WLF events, including its annual meeting, oversees donations made to the  WLF, keeps track of the annual donations to the WLF Endowment, keeps track of the names and addresses of the donors and the amounts that they donate, ensures that each donor is properly credited for tax purposes, oversees the donors' eligibility for membership in the WLF Leadership Council, and ensures that donors to WLF Endowment and/or the NRA Foundation receive the appropriate recognition for their fundraising in the form of a brooch and jewel that corresponds to a certain level of giving.

70. WLF Leadership Council members are leaders within the NRA community who have given or gathered $25,000 a year or more in support of the NRA, the NRA Foundation, or any of their affiliated entities.

71. Membership on the WLF Executive Committee, led by two (2) co-chairs and a vice chair, is by invitation only through a closed and closely controlled nomination process. While employed by the NRA, Tyler Schropp and Wayne LaPierre handpicked the members of the WLF Executive Committee from the list of nominees.

72. The original Co-Chairs of the WLF Leadership Council were Janet Nyce and LaPierre's wife, Susan LaPierre. The Co-chairs from 2022 through 2024 were Janet Nyce and Jane Brown. Ms. Nyce was Co-Chair for a total of nine (9) years; she was a member of the WLF Leadership Council for twenty years.

73. Janet Nyce is a member of the NRA's Board of Directors.

74. The WLF Leadership Council's committee members are enthusiastic advocates who work closely with the NRA's Office of Advancement and other NRA leaders to advance the mission of the Women's Leadership Forum.

75. The NRA bestows three (3) annual awards specifically designed to recognize NRA Women members for their work in support of the Second Amendment. These include the NRA Lifetime Achievement Award, the Marion P. Hammer Woman of Distinction Award, and The Sybil Lundgren Award. The NRA bestowed each of these three (3) awards on NRA Board Member and former WLF Co-Chair Janet Nyce.

76. The NRA's WLF Endowment was created within the NRA Foundation to assist with securing the future of the NRA through philanthropic leadership. It is funded by donations made by the general public, by NRA members, and by the members of the WLF. The WLF Endowment is one of many endowments within the NRA Foundation, to which donors may make donations to

12

further the mission of Foundation.

## H.  THE NEW YORK TRIAL

77.     In 2020, New York's Attorney General Letitia James brought a civil action against LaPierre and three (3) other members of the NRA leadership based on allegations of financial mismanagement and misuse of NRA funds for personal luxury expenses in violation of New York and federal law.

78.     The first phase ("Phase One") of the New York Trial began on January 8, 2024.

79.     On February 23, 2024, the jury in the New York Trial found, among other things, that between March 20, 2014, and May 2, 2022, the NRA failed to manage its finances in compliance with applicable state and federal law by, among other things,  using donated monies to pay for lavish luxury items used by Wayne LaPierre.

80.     The jury also found that the NRA violated New York Law by unlawfully retaliating against eight (8) NRA employees who engaged in protected whistleblower activity with respect to the NRA's financial mismanagement.

81.     The jury also found that (a) Wayne LaPierre, (b) Wilson Phillips, the NRA's former Chief Financial Officer, and (c) John Frazer, the NRA's Secretary and General Counsel, violated their federal and state statutory obligations to discharge the duties of their positions in good faith.

82.     The jury found that LaPierre was responsible for $5.4 million dollars in monetary harm to the NRA through, among other things, lavish spending on himself.  The jury found LaPierre liable to the NRA in the amount of $5,400,000.00 less $1,000,000 that he had already repaid the NRA.

83.     The testimony and evidence showed that Tyler Schropp participated in LaPierre's self-dealing by utilizing an American Express card that Ackerman McQueen issued him beginning in or around 2009 to purchase luxury expenses for the personal benefit of himself, LaPierre and others. Ackerman McQueen then passed the cost of the expenses onto the NRA through ambiguous invoices,

thereby avoiding the NRA's internal financial controls and concealing these expenses from disclosures required by federal law, New York law, and the laws of other states that required the NRA to disclose its finances.

84.     As a result of the New York Trial, the following information became publicly available:

a.     An internal investigation found that Tyler Schropp improperly expensed hundreds of thousands of dollars in prohibited expenses, including first class flights and luxury hotels during the period of 2016 to 2018.

b.     Whistleblower documents and testimony introduced during Phase One of the New York Trial showed that Tyler Schropp improperly allowed expenses related to a personal vehicle for Chris DeWitt, a staffer under Schropp's supervision, to be assigned to the budget of the major gifts program called the Ring of Freedom.

c.     Testimony during Phase One of the New York Trial revealed that Tyler Schropp authorized the same former staffer, Chris DeWitt, to expense items for the employee's personal use, including, but not limited to, a tuxedo rental for over $950, personal subscription services for iTunes and LinkedIn, and other personal uses over a period of years, all the while ignoring calls from staff in the office of the Chief Financial Officer regarding these expenses.

d.     Exhibits and testimony showed that NRA funds paid for lavish expenses for Colleen Sterner, including, but not limited to, (a) an $11,000 flight for Ms. Sterner and her daughter from Dallas to Nebraska; (b) a $27,000 flight for Ms. Sterner and her daughter from Dallas to the Bahamas; and (c) a $15,000 flight for Ms. Sterner's husband so that he could "babysit" her daughter while she worked (d) black car services for Ms. Sterner, her husband, and their daughter.

e.     Documents and testimony showed that Tyler Schropp approved payment for an

NRA vendor to take personal photographs of Ms. Sterner and her young daughter at an NRA event.

85. The Second Phase ("Phase Two") of the New York Trial commenced on July 15, 2024.

86. Tyler Schropp was never called to testify during either Phase One or Two of the New York Trial.

87. Following the conclusion of Phase Two, on July 29, 2024, Judge Cohen ruled that Wayne LaPierre was banned from holding a paid position with the NRA for ten (10) years but declined to appoint an independent monitor to oversee the NRA's finances.

88. On August 1, 2024, two (2) days after Phase Two of the New York Trial ended, Tyler Schropp's employment with the NRA was terminated.

## I. APRYL MARIE FOGEL'S EMPLOYMENT WITH THE NRA

89. On March 6, 2023, ten (10) months before Phase One of the New York Trial began, Fogel joined the NRA as the Director of the WLF. **Exhibit A.**

90. The NRA hired Ms. Fogel after an exhaustive three (3) month hiring process.

91. Ms. Fogel was interviewed by five NRA staff members, had several follow-up informational calls with the WLF's Co-founder, Susan LaPierre, and had a conference call with WLF leadership Co-Chairs Janet Nyce and Jane Brown and Vice-Chair Barbara Rumpel.

92. Ms. Fogel's candidacy for the position garnered the support of four (4) of the NRA's then-current Board Members, including all three (3) women past presidents of the NRA.

93. As the Director of the WLF, Ms. Fogel was paid a $150,000 annually, received paid medical, dental, and vision insurance, was able to provide for these benefits for her children at her own expense, received a term life insurance policy, and was able to contribute to a 401k plan with matching.

94. Throughout her employment, Ms. Fogel reported directly to (a) Tyler Schropp, the

Executive Director of the Office of Advancement, and (b) Janet Nyce and Jane Brown, the co-chairs of the Women's Leadership Forum.

95.     When Ms. Fogel's employment commenced, the NRA placed Ms. Fogel on a standard ninety-day probationary period.

96.     As the Director of the WLF, Ms. Fogel's duties included providing daily on and off-site leadership, management, and coordination of the NRA-WLF.  Her duties also included:

   a.   assisting with the development and management of long-term and annual strategic plans and budgets for the NRA-WLF to achieve its goals and objectives;

   b.   coordinating the NRA-WLF team's effort to achieve all its objectives for the NRA annual meeting;

   c.   taking the lead in developing the submission of a budget for the NRA-WLF for the next fiscal year to support the strategic goals and objectives of the program, including revenue projections, costs, and capital expenditures; and

   **d.**   monitoring and evaluating the current year's NRA-WLF budget to ensure efficient expenditure of fiscal resources and affect timely payment of invoices while ensuring operations are within budget guidelines.  **Exhibit B.**

97.     As the WLF Director, Ms. Fogel was responsible for, among other things, overseeing the WLF's administrative staff, including employees and independent contractors who provided support services to the WLF.

98.     As the WLF Director, Ms. Fogel was responsible for, among other things, reviewing and authorizing payment of the invoices for independent contractors and other vendors who provided services and products to the WLF.

99.     As the WLF Director, Ms. Fogel was responsible for raising funds for the WLF.

100.     Mr. Schropp told Ms. Fogel that it sometimes took several years to raise significant

funds from donors. Ms. Fogel raised around $10,000 in cash donations as a result of recruiting two (2) new WLF members and two (2) new Ring of Freedom members during her brief tenure at the NRA. She increased sponsorship levels for several WLF Luncheon and Auction sponsors and donors. In addition, just weeks before Ms. Fogel's employment was terminated, she secured a written pledge in the amount of $100,000 to create an endowment in the name of Marion Hammer that would have been funded in late September. Exhibit C.

101.    While employed by the NRA, Ms. Fogel worked both at her office at the NRA Headquarters in Fairfax, Virginia, and from her home in Birmingham, Alabama.

102.    As the WLF Director, Ms. Fogel worked closely with Susan LaPierre, the WLF's founder and former co-chair.

103.    As the WLF Director, Ms. Fogel worked closely with Megan Allen, WLF's Program Manager from 2019 to 2023, who reported directly to Ms. Fogel until she left the organization in the summer of 2023.

104.    Erika Erkel replaced Ms. Allen, but Ms. Erkel refused to work for Ms. Fogel.

105.    Ms. Fogel very occasionally worked with Wayne LaPierre's niece, Colleen Sterner, who was an NRA-WLF staff member. During her employment with the NRA, Ms. Fogel was surprised to learn Ms. Sterner was employed full-time because they had such limited interactions. Those interactions included discussing table settings for the "Princess Table" and securing a popcorn machine for the annual WLF Luncheon and Auction. During the annual meeting, Ms. LaPierre also asked Ms. Fogel to direct Ms. Sterner to place flower arrangements in the women's restroom.

106.    Tyler Schropp hired Colleen Sterner.

107.    During her full-time employment with the WLF, Colleen Sterner was *also* employed by a car dealership, Gateway Motors, a Chevrolet dealership in Broken Bow, Nebraska, and received $50,000 from Associated TV and NRA vendor for two (2) NRA town halls.

108.    As the WLF Director, Ms. Fogel worked with Tyler Schropp's Executive Assistant, Laura Evans.  Ms. Evans often acted with supervisory authority over Ms. Fogel, telling her, "I speak for Tyler" when she gave Ms. Fogel instructions.

109.    As the WLF Director, Ms. Fogel also worked with Callie Davis, the Director of Communications for the Office of Advancement.

110.    Prior to joining the NRA, Ms. Fogel had significant experience working with tax exempt charitable organizations.  She knew at the time she was hired by the NRA that both federal and state laws govern these organizations with respect to financial management.

111.    As a result of her experience working with tax-exempt charitable organizations, Ms. Fogel generally understood that the NRA, the NRA Foundation, and the WLF Endowment were required by both federal and applicable state law to maintain accurate records of the amounts of any donations made to the NRA, the NRA Foundation, and/or the WLF Endowment and to maintain accurate records of the identity of all donors (including their names and addresses and the amount of their donations), and to ensure that the NRA  used the donated funds for the purposes for which the donor intended.

112.    Ms. Fogel also understood that the NRA and its officers, directors, and key persons were required to observe certain standards of conduct in order to manage and invest the NRA's institutional funds in compliance with federal and state law.

113.    In particular, Ms. Fogel understood that the NRA and the WLF we required to be fiscally responsible and refrain from using NRA/WLF budgeted funds for expensive services, lavish gifts, and personal gain.

114.    When Ms. Fogel joined the NRA, Ms. Fogel understood that several whistleblowers had come forward to report that the NRA was not complying with applicable federal and state law regarding financial management of and accurate financial disclosures of the NRA's revenue and

expenses.

115.    While at the NRA, Ms. Fogel understood that the NRA was under pressure as a result of the New York Trial to demonstrate that it carefully followed applicable federal and state law regarding the financial management of the NRA and the financial management of the funds donated to the NRA Foundation and its individual endowments, including the WLF.

116.    While at the NRA, Ms. Fogel understood that the New York Trial included allegations of financial mismanagement in violation of federal and New York law that included allegations that Wayne LaPierre and others improperly used NRA funds to pay for lavish expenses, including black car services.

117.    While employed by the NRA, Ms. Fogel understood that the NRA strictly prohibited the use of black car services, largely on account of the allegations of financial abuse at issue in the New York Trial.

118.    When Ms. Fogel commenced work at the NRA, she viewed herself as part of the effort to ensure that the NRA complied with applicable federal and state law with respect to financial management and proper use of donated funds.

119.    When Ms. Fogel was employed by the NRA, she assumed that Tyler Schropp and Janet Nyce were equally committed to ensuring that the NRA complied with applicable federal and state law with respect to financial management and use of donated funds.

120.    When Ms. Fogel was employed by the NRA, Ms. Fogel was unaware that Tyler Schropp was intrinsically involved with the financial mismanagement of the NRA's funds by the NRA and, more specifically, Wayne LaPierre. She was unaware that Ackerman McQueen had issued him an American Express card for the purpose of paying for, among other things, expensive hotel reservations and black car services for Wayne LaPierre. She was also unaware that Ackerman McQueen then obscurely included these charges on its invoices to the NRA in order to circumvent institutional

controls to prevent financial mismanagement and, particularly, self-dealing.

121.     Ms. Fogel's employment with the NRA ended on October 2, 2023, three (3) months before the New York Trial commenced.

**J. MC500 and BLACK CAR SERVICES**

122.     After Ms. Fogel joined the NRA, she became aware that the NRA's Office of Advancement had a long history of engaging MC500 Marketing and Media ("MC500"), a consulting company owned by two (2) partners, Jennifer Bridgman and Brian Hoffman, to assist the WLF.

123.     Jennifer Bridgeman, MC500's co-founder and Chief Marketing Officer, provided communications and marketing services to its Mc500's clients, including, but not limited to, speechwriting, executive communications, and fundraising promotions and appeals.

124.     Brian Hoffman, MC500's co-founder and Chief Executive Officer, is a corporate and celebrity security specialist.

125.     While Ms. Fogel was employed by the NRA, Jennifer Bridgeman and Brian Hoffman charged the NRA-WLF for its services at the rate of $150 per hour.

126.     Before Ms. Fogel joined the NRA, MC500 charged the NRA-WLF a much higher rate for its services.

127.     While at the NRA, Ms. Fogel learned that the NRA often paid for the cost of airfare to fly Ms. Bridgeman and/or Brian Hoffman to multiple NRA events, both before Ms. Fogel became employed by the NRA and while she was employed by the NRA.

128.     While employed by the NRA, Ms. Fogel learned that the contract between MC500 and the NRA, in effect at the time of her employment, did not state that Brian Hoffman or anyone with MC500 was engaged to provide the NRA and/or the WLF security services and/or black car services.

129.     While employed by the NRA, Ms. Fogel learned that both before and during Ms.

Fogel's employment, MC500's Brian Hoffman routinely rented a high-quality, well-maintained vehicle, such as a black SUV, in which Mr. Hofmann chauffeured WLF Executive Committee Member, Janet Nyce, at NRA and/or WLF events throughout the country.

130.    Before and during Ms. Fogel's employment, MC500's Brian Hoffman also sometimes rented a high-quality, well-maintained vehicle, such as a black SUV, to chauffeur select NRA staff and VIP donors at NRA and/or WLF events throughout the country.

131.    On one occasion, Janet Nyce invited Ms. Fogel to join her to ride in a high-quality, well-maintained vehicle chauffeured by Mr. Hoffman at an NRA/WLF event.

132.    Ms. Fogel did not interact with Mr. Hoffman before, during, or after the NRA Annual Meeting in any capacity beyond his chauffeuring services. He did not perform any other services, such as consulting or marketing services, for the NRA-WLF.

133.    While employed by the NRA, Ms. Fogel determined that both before and during her employment with the NRA, MC500 billed NRA for the cost of renting a car to chauffeur Janet Nyce at NRA business meetings and events. It also billed the NRA $150 per hour for Mr. Hoffman to provide security and chauffeur services to Ms. Nyce and select members and staff throughout the week.

134.    Ms. Fogel knew that the black car services that MC500 provided at the sole request of Janet Nyce violated NRA policy prohibiting the use of black car services.

135.    While employed by the NRA, Ms. Fogel concluded that the black car services provided by the MC500 likely violated federal and state law regarding financial mismanagement, regarding disclosure of expenses, and self-dealing.

136.    While employed by the NRA, Ms. Fogel determined that both before and during her employment with the NRA, MC500 disguised these costs on its invoices as "On-Site WLF Staffing."

137.    Ms. Fogel also discovered that Ms. Bridgeman billed the WLF at the rate of $150 per hour (i) for work that Ms. Fogel and other members of her staff could accomplish and (ii) for work

21

product that Ms. Bridgeman did not complete and/or perform at all.

138.    In at least instance, Ms.  Bridgman drafted "scripts" for the volunteer leadership to read and took minutes at a meeting at which three (3) full-time NRA staff were present.  The tasks that Ms. Bridgeman performed at this meeting were tasks that Ms. Fogel and her staff could easily have accomplished as part of their regular duties.

139.    While employed by the NRA, Ms. Fogel learned, that the NRA intended to pay the cost of flying Ms. Bridgman to an NRA event in Florida in September 2023 to have her take minutes of a meeting of the WLF Executive Committee at Janet Nyce's request, even though Ms. Fogel and the WLF's administrative staff would have had both the time and the ability to take these minutes without incurring any additional cost to the NRA beyond their regular compensation as NRA employees.

140.    During her employment with the NRA, Ms. Fogel came to believe that the marketing, speechwriting, and other services that Janet Bridgman provided the WLF and Janet Nyce, in particular, the security and black car services that Brian Hoffman provided the WLF and Janet Nyce, in particular, violated NRA policy, New York law at issue in the New York Trial, and as well as state and federal law that govern the financial management and use of funds by tax-exempt, non-profit charitable organizations.

141.    In or around April 3, 2023, Ms. Fogel was preparing for the WLF events and meetings at the NRA Annual Meeting.

142.    Around this same time, Ms. Bridgeman missed several deadlines and stopped communicating with all NRA staff.  Accordingly, Ms. Fogel decided to reduce WLF's costs and expenses by reassigning Ms. Bridgman's administrative duties and tasks to WLF staff.

143.    Thereafter, Ms. Nyce telephoned Ms. Fogel to discuss her decision to re-assign Ms. Bridgeman's tasks to NRA-WLF Staff.  During their telephone conversation, Ms. Nyce shouted at Ms. Fogel for objecting to the cost of utilizing Ms. Bridgeman when the WLF staff could do the same work

for less. Ms. Nyce told Ms. Fogel that as the co-chair, it was her prerogative to incur whatever cost she saw fit for the WLF program.

144.    Ms. Fogel informed Ms. Nyce that she would address Ms. Nyce's concerns with her supervisor, Mr. Schropp. Mrs. Nyce screamed that she would call him herself and that he would put Ms. Fogel in her place.  She then ended her call without saying goodbye.

145.    That same day, Mr. Schropp called Ms. Fogel about her conversation with Mrs. Nyce. Ms. Fogel explained to Mr. Schropp that utilizing MC500's chauffer and marketing services were both unreasonably expensive, excessive, and unnecessary,  violated  NRA policy, which also violated state and federal law.   Mr. Schropp angrily dismissed Ms. Fogel's concerns and told her to, "stay in her lane."

146.    Prior to these conversations with Tyler Schropp and Janet Nyce regarding the use of Ms. Bridgeman, Ms. Fogel enjoyed a positive and collegial relationship with Tyler Schropp and Janet Nyce.  After these two (2) heated conversations about Jennifer Bridgeman, both Tyler Schropp and Janet Nyce retaliated against Ms. Fogel for objecting to these expenses by routinely treating Ms. Fogel hostilely and negatively, thereby creating a toxic work environment that changed the conditions of her employment for the worse.

147.    Roughly two (2) weeks after these conversations, Janet Nyce convened a meeting of the WLF staff and leadership at the NRA Annual Meeting in Indianapolis, but *excluded* Ms. Fogel, the Director of the WLF, from this meeting.

148.    On or around April 21, 2023, Milissa Coder, a Director in the Office of Advancement responsible for contracts, and her direct report, Josh Kosters, Reporting and Budget Manager, asked Ms. Fogel if she had pre-authorized roughly $14,000 in expenses for services and transportation provided by MC500 to the WLF at the recent NRA annual meeting and for which it had billed the NRA.

149.    This invoice included "Car rental reimbursement for WLF transportation," or a similar statement, to cover black car services.  The invoice included another vague line item that covered the chauffeur and security services provide by Brian Hoffman.

150.    Ms. Fogel told Milissa Coder that she had not pre-authorized the expense and that she believed that this expense was "exorbitantly high and nearly completely unnecessary."  Fearing further retaliation by Tyler Schropp and Janet Nyce, Ms. Fogel told Ms. Coder to, "get it paid before [Ms. Bridgeman] calls Janet who then calls Tyler to complain about me raising questions again."

151.    In or around mid-August, Ms. Coder asked Ms. Fogel to approve two (2) additional invoices for MC500.  Ms. Fogel told Mr. Schropp's assistant, Laura Evans, that she refused to approve the invoices because she could not validate the claimed hours or that the services were actually provided.  Ms. Evans, who routinely said, "I speak for Tyler," told Ms. Fogel to approve the invoices.  Ms. Evans treated Ms. Fogel's inquiries and concerns with disdain and contempt, contributing to the toxic work environment in which Ms. Fogel was forced to work.

152.    Around this same time, Ms. Fogel became aware that shortly after leaving the NRA Office of Advancement, Callie Davis went to work for MC500. The Office of Advancement was so disappointed to lose Ms. Davis, that they then agreed to hire Ms. Davis as a consultant for the NRA. The job description of Ms. Davis's position at MC500 included the same duties as she had at the NRA, however, the NRA paid her and MC500 a significantly higher rate for her services.   Fearing further retaliation, Ms. Fogel did not report this information to Mr. Schropp or Ms. Nyce even though she believed this was further evidence of NRA fiscal mismanagement with respect to MC500.

## K.  THE BACCARAT CRYSTAL BUTTERFLY

153.    Around April 1, 2023, Susan LaPierre tasked Ms. Fogel with buying a gift for Janet Holcombe, who was at the time and still is the wife of the Governor of Indiana.

154.    Mrs. LaPierre instructed Ms. Fogel to purchase a $240 Baccarat crystal butterfly with

her personal credit card and then seek reimbursement from the NRA.

155. Ms. Fogel grew worried that Mrs. LaPierre requested her to purchase the gift in this manner to conceal the expense and circumvent NRA's procurement guidance.

156. Nevertheless, Ms. Fogel reluctantly purchased the crystal butterfly with a personal credit card as instructed and had it delivered to Megan Allen at the WLF's office in Indianapolis, Indiana.

157. Ms. Fogel grew concerned that the gift violated Indiana's laws with respect to the value of gifts that Janet Holcombe was permitted to accept.

158. Ms. Fogel confirmed that the gift's price exceeded the allowable limit under Indiana law and necessitated that Ms. Holcombe disclose the gift.

159. Upon confirming this information, Ms. Fogel stepped into a meeting (the same meeting Janet Nyce excluded Ms. Fogel from in retaliation for her complaining to Ms. Nyce and Mr. Schropp regarding the use of MC500) between Susan LaPierre, WLF co-chair Janet Nyce, WLF co-chair Jane Brown, MC500's Jennifer Bridgeman, and other WLF staff, including Ms. Fogel's subordinate, Megan Allen, to inform Ms. LaPierre that the Baccarat crystal butterfly exceeded the gift value that the First Lady of Indiana was permitted to accept from the NRA without disclosing it.

160. Janet Nyce and Susan LaPierre expressed anger and frustration with Ms. Fogel for determining that the gift exceeded the legal limit and blamed her for impeding their effort to provide Janet Holcombe with the gift that they "regularly used" in the past with no issues.

161. As a result of her concerns and based upon prior 501(c)(3) and 501(c)(4) training, Ms. Fogel used a less expensive gift for Ms. Holcombe so that she would not have to disclose the gift to comply with Indiana law.

162. Prior to this event, Ms. Fogel enjoyed a positive working relationship with WLF co-chair Jane Brown. After this meeting, her working relationship with Ms. Brown deteriorated. After

this meeting, Ms. LaPierre, Ms. Nyce, Megan Allen, and the others in that meeting began retaliating against Ms. Fogel by treating her with disdain and contempt, creating a toxic work environment that changed the terms and conditions of Ms. Fogel's employment for the worse.

163. Having decided to return the Baccarat crystal butterfly in order to obtain a refund, Ms. Fogel repackaged the Baccarat crystal butterfly using its enclosed return label.  On or about April 14, 2023, Ms. Fogel gave the package to her subordinate, Megan Allen, and requested that she mail it right away to ensure that it was returned in the thirty-day window so that she would receive a refund.

164. On or around June 7, 2023, Ms. Fogel returned to her office at NRA headquarters and discovered the sealed and addressed package containing the Baccarat crystal butterfly placed on the center of her desk.  The thirty-day return window had expired, and Ms. Fogel could not return the expensive gift.

## L.  MEGAN ALLEN

165. On or around April 14 through 16th, 2023, Ms. Fogel and Ms. Allen attended the NRA's Annual Convention in Indianapolis.

166. As part of her duties, Ms. Fogel was responsible for coordinating the WLF events being held there.

167. As part of her duties, Ms. Allen was to provide Ms. Fogel with support services to ensure that Ms. Fogel fulfilled her objectives as the Director of the WLF.

168. Ms. Allen repeatedly failed to provide Ms. Fogel with certain deliverables, intentionally avoided Ms. Fogel and performed tasks for Ms. Sterner instead of Ms. Fogel.

169. Ms. Fogel admonished Ms. Allen for failing to complete her work, refusing an assignment outright, and for purposefully avoiding Ms. Fogel. Upon information and belief Ms. Allen and/or Ms. Sterner falsely communicated to others at the NRA that Ms. Fogel "screamed" at Ms. Allen when Ms. Fogel reprimanded her.

**170.** On April 15, 2024, Ms. Allen apologized for being "such a bitch" to a WLF volunteer who is Ms. Fogel's close friend.

## M. SECURITY BREACH AND DATA OWNERSHIP CONCERNS

171.  The NRA and the NRA Foundation both have specific protocols to protect the confidential, proprietary, and sensitive information pertaining to the NRA's members and their donors.

172.  In or around early May 2023, Ms. Fogel discovered that MC500 was responsible for a serious threat to the security of its confidential information.

173.  Ms. Fogel determined that MC500's Janet Bridgeman was the "owner" of a Dropbox account named "WLF Shared Folder" that she shared with the NRA staff and Susan LaPierre in particular.

174.  The WLF Shared Folder contained over 23,000 files which included confidential and sensitive member and donor information as well as proprietary NRA operations planning documents.

175.  Further, Ms. Bridgeman had enabled "link sharing," thereby allowing *anyone* with a link to the WLF Shared Folder to both *access and edit* the documents in this folder.

176.  Ms. Fogel then determined that NRA staff who *left the organization nevertheless maintained access* to documents in this folder.

177.  Ms. Fogel concluded in good faith that the NRA's use of the WLF Shared Folder and the link that permitted former employees to have access to the WLF Shared Folder created a serious security breach that left existing and newly entered confidential and proprietary information and other sensitive information, such as information about donors and members, including, but not limited to, their home addresses and how much they donated to the NRA, vulnerable to security threats in violation of the NRA's privacy policies and state law.

178.  In or around mid-May 2023, Ms. Fogel raised her concerns about the security breach in good faith with her supervisor, Tyler Schropp.  Mr. Schropp ignored her concerns.

179. Around this same time, Ms. Fogel advised her colleagues and subordinates not to continue to use the WLF Shared File, but they ignored her.

180. Around this same time, Ms. Fogel also copied all the documents in the WLF Shared File and saved them to an internal shared hard drive so that the NRA's documents would be stored on a secure drive that the current NRA staff could utilize and to which former NRA staff would not have access.

181. Around this same time, Ms. Fogel recognized that the settings on the Dropbox were set to such that "Anyone with link" could access confidential donor information. Ms. Fogel toggled this function off only to realize the next time she checked that someone had reactivated it.

182. In or around early June, Ms. Fogel e-mailed Ms. Bridgeman to ask her to transfer ownership of the WLF Shared File to an NRA employee.  Ms. Bridgeman ignored her e-mail.

183. In or around mid-June, Ms. Fogel e-mailed Milissa Coder, a Director in the Office of Advancement who had supervisory authority over Ms. Fogel, regarding whether the MC500 contract specified that Ms. Bridgman was to maintain ownership of all the files that she created while working with the NRA.  Ms. Coder did not answer her question.

184. On or about September 15, 2023, after exhausting all internal avenues within the Office of Advancement, Ms. Fogel communicated her findings and concerns about the WLF Shared Filed by e-mail to the NRA Security Manager Bob Jenkins.  He confirmed that that the WLF Shared File was not secure and posed a significant security risk.  Together, they discussed how to solve this security issue.

**N. FINANCIAL MISMANAGEMENT AND INADEQUATE RECORD-KEEPING**

185. Within the NRA WLF, the women who cumulatively give and/or gather $25,000 or more in donations to the WLF Endowment are inducted into the Leadership Council, a special honor recognizing its most generous donors.

186. Newly inducted Members of the Leadership Council are recognized with a

commemorative NRA Women's Leadership Forum brooch designed by Elichai Fine Jewelry that is adorned with a pearl.

187. Once inducted to the Women's Leadership Council, members then receive additional stones that reflect their level of giving or gathering.

188. Members of the Leadership Council who donate and/or raise between $50,000 and $99,999 receive a sapphire gemstone from the NRA to adorn their brooch to designate their level of fundraising.

189. Members of the WLF Leadership Council who donate and/or raise between $100,000 and $4999,9999 receive an emerald gemstone from the NRA to adorn their brooch to designate their level of fundraising.

190. Members of the WLF Leadership Council who donate and/or raise between $500,000-$999,999 receive a ruby gemstone from the NRA to adorn their brooch to designate their level of fundraising.

191. Members of the WLF Leadership Council who give and/or raise more than $1,000,000 receive a diamond gemstone from the NRA to adorn their brooch to designate their level of fundraising.

192. Members of the WLF Leadership Council covet these brooches and aspire to display the most valuable gemstones on their brooch.

193. When Ms. Fogel commenced her employment, she set upon reviewing internal WLF financial data and documents to determine a number of factors that would enable her to best perform her duties, including managing the WLF's current budget, preparing its budget for the next fiscal year, and ensuring the WLF members received the correct jewel for the fundraising broach.  To achieve these goals, Ms. Fogel reviewed the following data points: (a) how much WLF members had donated in the past; (b) whether the WLF members had been properly credited for their cumulative donations;

(c) whether WLF members who raised money from third parties were accurately credited with the money that they raised through their "gathering" efforts (a process that credited the member as opposed to donated themselves); and (d) whether the WLF members' respective donations had been utilized for the purpose designated by the respective donors.

194.  Ms. Fogel initially struggled to obtain the records necessary to complete her audit.  No one she spoke with acknowledged having the historical documentation that she required to complete her audit.

195.  After analyzing these records, Ms. Fogel determined that the record-keeping for the WLF member donations was incorrect, haphazard, unsystematic, and generally not in keeping with any generally accepted accounting standards or best practices utilized by non-profit operations to track donations as required by federal and state law.

196.  Ms. Fogel also attempted to locate previous fundraising plans as a frame of reference for drafting her own.  Mr. Schropp did not have a copy. Ultimately, Ms. Fogel was shocked to conclude that none of Ms. Fogel's predecessors had *ev*er drafted a fundraising plan—an essential document for fulfilling the duties of the Director of the WLF.

197.  Ms. Fogel discovered that the WLF sometimes sponsored small NRA fundraising events at private locations but failed to create and /or maintain proper record-keeping procedures for tracking the costs of such events and the amounts donated at such events. These longstanding practices made it difficult to tie particular donations with particular events and with individual donors.

198.  Ms. Fogel first identified this problem when a WLF member asked her to ensure that she was properly credited for a $40,000 donation that she made years earlier.  Ms. Fogel determined that the WLF sponsored a fundraising event at this WLF member's home.  The WLF member who hosted the event collected donations from WLF members and others who attended the event.  The donors donated money to the WLF at the event by making out their checks to the WLF member personally or

to the name of the WLF member's business.  The WLF member did not record the name and address of the donors, the amount of their respective donations, or the designated purpose of their respective donations.  The WLF member then deducted the cost of the event from the collected donations. The WLF member did not, however, create a record of the cost of the event.  The WLF member then wrote a check for a donation of $40,000 from that member's business account made out to the WLF.  Because the WLF lacked standard record-keeping procedures, Ms. Fogel was unable to ascertain the identities of the individual donors, the amount of their donations, and whether the $40,000 accurately reflected the difference between the cost of the event and the amount of donations raised at the event.

199.  As a result of her audit, Ms. Fogel also determined that some WLF members contributed to and gathered donations for the designated WLF Endowment with the explicit understanding per written materials and verbal promises that once the endowment was fully funded, the residuals of their donation would be used annually for particular NRA programs.

200.  Ms. Fogel determined that despite these designations, the WLF did not utilize these funds for the intended purpose but redeposited the funds in the WLF Endowment, where they remained for the purpose of growing the fund.

201. Through this same audit, Ms. Fogel determined that the methodology utilized by the NRA to calculate the cumulative donations attributable to a WLF member was incorrect, haphazard, and lacked consistency.   As a result, some WLF members were not properly credited with their cumulative donations and/or gathering efforts, resulting in some WLF members receiving the incorrect jewel for their brooch. Ms. Fogel identified that some WLF members received a jewel for their broach that reflected a higher cumulative donation than they merited and that other WLF members received a jewel that reflected a lower cumulative donation than they merited.

202. Ms. Fogel extensively researched WLF records from May to August 2023 to reach the findings described above. Ms. Fogel was shocked and disturbed by the results of her review and audit

and concluded that the WLF's record-keeping and other practices outlined above were inconsistent with the NRA's policies and procedures and most likely violated state and/or federal law that governed the NRA as a tax-exempt, not-for-profit charitable organization.

## O. MORE WHISTLEBLOWING AND WHISTLEBLOWER RETALIATION

203.   On or about June 6, 2023, Ms. Fogel had a debrief and planning meeting with Tyler Schropp in Fairfax, Virginia. During this meeting Ms. Fogel again expressed her concerns about using Ms. Bridgeman because she was expensive, her services were redundant, and she did not always complete her assignment.  She also told him that Janet Nyce requested that Ms. Fogel credit her with donations that someone else had raised.   Ms. Fogel also expressed concerns about the WLF's financial mismanagement and inadequate record-keeping procedures.

204.    In or around early June, Ms. Fogel met again with Tyler Schropp in Fairfax, Virginia, and orally communicated many of her findings of financial mismanagement and record-keeping failures, which she believed violated federal and state record-keeping and disclosure requirements. She assumed that he would want to know about these issues and correct the financial mismanagement going forward. Sometimes Mr. Schropp asked her to keep him posted. He did not communicate any concerns regarding her performance.

205.    On June 27, 2023, Ms. Fogel met with Mr. Schropp and Linda Crouch, the NRA's Executive Director of Human Resources in Fairfax, Virginia. During this meeting, Ms. Crouch informed Ms. Fogel that Mr. Schropp had decided to extend Ms. Fogel's probationary period for another ninety days.

206.    Ms. Crouch told Ms. Fogel that the extension was routine for employee who worked remotely; Ms. Fogel worked at her office in Fairfax and at home in Alabama.

207.    Mr. Schropp advised Ms. Fogel that: (1) Ms. Fogel improperly brought her son to work at the Fairfax office on one occasion; (2) Ms. Fogel missed a meet-up with colleagues that was

held immediately prior to a meeting, although she attended the actual meeting on time; and (3) Susan LaPierre reported to Mr. Schropp that Ms. Fogel improperly complained to her about a male NRA staffer who rudely disparaged Ms. Fogel's fundraising experience.

208.  Neither Mr. Schropp nor Ms. Crouch mentioned any other reasons for extending her ninety-day probationary period. Neither Mr. Schropp nor Ms. Crouch ever mentioned the false allegation that Ms. Fogel had screamed at Ms. Allen at the NRA's Annual Convention in April 2023.

209.  Neither Mr. Schorpp nor Ms. Crouch communicated that her employment was in jeopardy of termination.

210.  On or about August 8, 2023, Ms. Fogel met with Mr. Schropp in Fairfax, Virginia, and communicated more of her findings and her continued concerns regarding the NRA-WLF's financial mismanagement and lack of record-keeping. Again, she believed that he would share her concern and wish to fix the problems she unearthed, but his reaction was strangely vague.  He did not communicate any concerns regarding her performance.

211.  In or around mid-September 2023, Ms. Fogel completed a written report summarizing these same findings and concerns.  She sent the report via e-mail to WLF Council Co-Chairs, Janet Nyce and Jane Brown, WLF Council vice chair, Barbara Rumpel, and Tyler Schropp.

212.  Ms. Fogel was prepared to present this report at the Women's Leadership Forum Executive Committee meeting scheduled for the Ring of Freedom, Freedom Summit at Trump Doral in Florida between Thursday, September 28, 2023, and Sunday, October 1, 2023.

213.  Ms. Fogel recommended to Mr. Schropp that he present some of the findings referenced above to the WLF Leadership Council at the upcoming WLF Executive Committee meeting at Trump Doral, Florida.  Ms. Fogel believed that he was better suited to share the results of her investigation because he was employed by the NRA when this financial mismanagement occurred and, therefore, would be better able to answer any questions.  He prevaricated at the idea.

214.    As previously mentioned, on or around September 15, 2024, Ms. Fogel reported her concerns about the WLF Shared File to NRA Security Manager Bob Jenkins.  On September 17, 2023--only a two (2) days after she reported the security breach to Bob Jenkins, only a few days after she sent her written report regarding the NRA-WLF's financial mismanagement to Janet Nyce, Jane Brown, Barbara Rumpel, and Tyler Schropp, the same day she was scheduled to receive NRA whistleblower training, and only a week  before she was scheduled to share her report of WLF financial mismanagement and record-keeping deficiencies with the WLF Executive Committee in Florida--Tyler Schropp and Laura Crouch met with Ms. Fogel in Fairfax, Virgnia, and terminated her employment without providing any explanation for their action.

215.    On September 19, 2023, Ms. Fogel e-mailed Laura Crouch to ask her why she had been terminated. Ms. Crouch responded within the hour via e-mail only that Ms. Fogel was employed at will and that the NRA had the right to terminate her employment at any time for any reason. **Exhibit D.**

216.    Ms. Fogel remained employed but on administrative leave until October 2, 2023, during which time she utilized her accrued but unused leave.

**P. EPIPHANY**

217.    Ms. Fogel closely followed Phase One of the New York Trial, which began in February 2024.

218.    As evidence was introduced in the form of testimony and documents, Ms. Fogel learned for the first time that Tyler Schropp was heavily involved in La Pierre's scheme of using NRA money for personal gain.

219.    Among other things, Ms. Fogel learned that Tyler Schropp expensed hundreds of thousands of luxury items, like hotel stays and private jets, on an Ackerman McQueen American Express card. Ackerman McQueen would then bill the NRA for the expenses using ambiguous descriptions,

thereby avoiding the NRA's expense review and approval process.

220.     Armed with this new information, Ms. Fogel realized that Mr. Schropp and Ms. Nyce were utilizing this same scheme to hire MC500 to provide security and black car services for Ms. Nyce and then disguise the cost with ambiguous entries on MC500's invoices.

221.     Armed with this new information, Ms. Fogel also realized that she had been reporting financial mismanagement and record-keeping problems that violated federal and state law in good faith to Mr. Schropp, Ms. Nyce, and Ms. Brown, incorrectly believing that Mr. Schropp, Ms. Nyce, and Ms. Brown would correct these wrongs.  She realized for the first time that Mr. Schropp was engaging in financial misconduct that enabled Ms. Nyce and himself and others to fleece the NRA for their own personal gain.

222.     Once Ms. Fogel appreciated the role that Mr. Schropp played in these financial abuses and the role he played with respect to penalizing, disciplining, and then discharging her after she made multiple reports of financial mismanagement and record-keeping failures that amounted to violations of state and federal laws, she realized that she was the victim of whistleblower retaliation.

### COUNT ONE: VIOLATION OF VA. CODE § 40.1-27.3

223.     Fogel re-alleges and incorporates by reference Paragraphs 1-222 above as if set forth fully herein.

224     The VWPL protects employees who engage in protected whistleblower activities from retaliation by their employers. Specifically, the law prohibits employers from discharging, disciplining, threatening, discriminating against, or penalizing an employee, or from taking other retaliatory action with respect to the employee's compensation, terms, conditions, location, or privileges of employment, because "the employee . . .  reports in good faith a violation of any federal or state law or regulation to a supervisor." VA Code  **§ 40.1-27.3**

225.     As specifically plead in Paragraphs 15, 143, `45, `50, 151, 159, 178, 184, 203, 204, 210, 211, and 212, above, Ms. Fogel reported in good faith violations of federal and state laws and regulations to her supervisors, Tyler Schropp, Milissa Coder, Laura Evans, Linda Crouch, Janet Nyce, Jane Brown, and Susan LaPierre.

226.     Tyler Schropp, Laura Evans, Jennifer Bridgeman, Megan Allen, Erica Erkel, Linda Crouch, Janet Nyce, Jane Brown, and Susan LaPierre and, therefore, the NRA violated the VWPL by retaliating against Ms. Fogel by (i) changing the conditions of Ms. Fogel's employment for the worse by creating a toxic work environment in which Ms. Fogel was forced to work by shunning Ms. Fogel and by permitting and encouraging Megan Allen,  Jennifer Bridgeman, and Erika Erkel to shun Ms. Fogel,  (ii)  penalizing her by, among other things, excluding her from a key WLF leadership meeting, ensuring that the Baccarat crystal butterfly was not returned on time, permitting and encouraging Megan Allen,  Jennifer Bridgeman, and Erika Erkel to shun Ms. Fogel,  excluding her from the hiring process for Erika Erkel, Megan Allen's replacement; (iii)   disciplining Ms. Fogel by harshly reprimanding her for raising concerns about MC500 and/or  by extending her ninety- day probation; and  (iv) discharging Ms. Fogel *because* she reported in good faith:

>   a.  to Susan LaPierre, Janet Nyce, and Jane Brown that the Baccarat crystal butterfly exceeded the value that the First Lady of Indiana could lawfully accept as a gift from the NRA without disclosing the gift;
>
>   b.  to Janet Nyce, Tyler Schropp, Laura Evans, and Milissa Coder that MC500 was providing Janet Nyce and other NRA employees with black car services and a security detail prohibited by NRA policy and by applicable federal and state law;
>
>   c.  to Janet Nyce and Tyler Schropp that MC500's Jennifer Bridgeman was providing the WLF with expensive and unnecessary consulting services that could be accomplished less-expensively by WLF staff members and that this unnecessary

expense violated applicable federal and state law;

d.  to Janet Nyce, Tyler Schropp, and Milissa Coder that MC500's Jennifer Bridgeman was billing the WLF for work that she did not complete, which likely violated federal and state law governing tax-exempt, not-for-profit charitable organizations;

e.  to Tyler Schropp and Bob Jenkins that the WLF Shared Folder created and maintained by MC500 and utilized by MC500 and the NRA violated the NRA's security protocols and possibly applicable state law governing the security of identifying information about NRA members and donors.

f.  to Tyler Schropp and Janet Nyce that the WLF Council and/or Executive Committee was not following its governance documents with respect to term limits for the co-chairs;

g.  to Tyler Schropp, Janet Nyce, Jane Brown, and Barbara Rompel that:

   i.   the WLF's records and record-keeping practices with respect to recording and disclosing WLF's fundraising expenses, the amount of donations the WLF raised, and the identities of WLF donors were not in compliance with applicable federal and state law;

   ii.  the WLF's methodology for awarding brooches often did not accurately reflect the amount the recipient donated and/or gathered;

   iii. NRA-WLF donors sometimes designated how they wanted their donations to be used and expected such donations to be used by a date certain but that the NRA-WLF was not honoring their designations, in violation of federal and state law governing use of donations made to tax-exempt, not-for-profit charitable organizations.

227.  In the alternative, Ms. Fogel's actions described in this Complaint and as listed in the

foregoing paragraphs were a contributing factor in the NRA's (through its agents identified therein) decisions, making those decisions retaliatory, to:

    a.  change the conditions of her employment for the worse by subjecting Ms. Fogel to a toxic work environment by, among other things, shunning her by excluding her from an NRA-WLF at the NRA's annual meeting in Indianapolis in April 2023

    b.  penalize her by excluding her from an NRA-WLF at the NRA's annual meeting in Indianapolis in April 2023;

    c.  penalize her by extending her probationary period;

    d.  discipline her by extending her probationary period;

    e.  discipline her via harsh reprimands for raising questions and concerns about MC500, the Baccarat crystal butterfly, the WLF Shared File, and the WLF record-keeping, practices for awarding brooches/jewels, and failure to use donations as designated;

    f.  discharge her from employment with the NRA for raising questions about financial mismanagement and record-keeping problems that likely violated federal and state law, including, but not limited to, her concerns about MC500, the Baccarat crystal butterfly, the WLF Shared File, and the WLF's lack of record-keeping with respect to the amounts donated, the names of donors, the cost of fundraising, and the purpose for which the donations were used.

228.    As a result of the NRA's violation of Virginia's Whistleblower Protection Law, Ms. Fogel suffered and continues to suffer financial harm including, but not limited to, the loss of salary, bonus, health insurance benefits, and other benefits offered by the NRA.

229.    Ms. Fogel has attempted to mitigate her damages by finding other gainful employment, but has been unable to find meaningful, continued employment.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, Apryl Marie Fogel, respectfully requests this Honorable Court find that the Defendant violated the Virginia Whistleblower Protection Law, Va. Code § 40.1-27.3and in accordance therewith those findings, the Plaintiff respectfully requests that this Court enter judgment in favor of the Plaintiff and against the Defendant, awarding the following relief:

I.    Reinstatement to the same position Ms. Fogel held when she was wrongfully terminated or to an equivalent position in terms of authority, compensation, and benefits.

II.   An award of lost wages and benefits and other remuneration in the amount of $150,000.00;

III.  An award of reasonable attorneys' fees and costs incurred by Plaintiff in this action.

IV.   Pre-judgment and post-judgment interest at a rate that is the maximum amount. permitted by applicable law; and

V.    Any other relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury in this action of all issues so triable.

**I ASK FOR THIS:**

**APRYL MARIE FOGEL**
**BY COUNSEL**

HARRISON & JOHNSTON, PLC

_____

Stephen L. Pettler, Jr. [Va. Bar. # 44336]
Jane E. Lemley [Va. Bar #36344]
Robert J. Sproul [Va. Bar # 92536]
21 South Loudoun Street
Winchester, Virginia 22601
Tel. 540.667.1266
Fax. 540.667.1312
pettler@harrison-johnston.com
jlemley@harrison-johnston.com
sproul@harrison-johnston.com

*Attorneys for the Plaintiff*

February 28, 2023

Apryl Marie Van Flein
1017 Jowers Lane
Birmingham, AL 35213

Dear Ms. Van Flein:

It is a pleasure to welcome you to the National Rifle Association staff in the position of Director, Women's Leadership Forum.  The salary for this position is approximately $5,769.23 on a bi-weekly basis ($150,000.00 if annualized).  This is an exempt position which is ineligible for overtime earnings.  Your start date is March 6, 2023. Please respond to this letter by contacting me in the Human Resources Division at (703) 267-1264 as soon as you have reached your decision, if you have not already done so.

Employment is contingent upon the receipt of satisfactory references and completion of appropriate forms, including our Statement of Corporate Ethics, NRA Employee Confidentiality Agreement and more.  The NRA believes that "at-will" employment serves the best interest of the employee and the NRA.  Accordingly, the NRA practices "at-will" employment in which either the employee or the NRA may terminate the employment relationship at any time and for any reason.  In the event of any dispute, the venue would be in Virginia and Virginia law would apply.

Enclosed in the accompanying email are instructions for completing all paperwork required to process your employment; please complete and sign the forms not later than your start date.  You will be required to show proof of your legal right to work in the United States.  Examples of acceptable identification are listed on a link in the onboarding page where you complete the new hire portion of Form I-9. This original, unexpired identification will be required on your first day of employment.

Please acknowledge your receipt and understanding of this letter by signing below.  If you have any concerns about its contents, please respond in writing before your start date.  Keep one copy for your files and return the original to my attention.

We look forward to your becoming a member of the NRA staff and believe you will make a very positive contribution.

Sincerely,

Linda S. Crouch

Linda S. Crouch, MEd, MA, MS
Executive Director, Human Resources


_____            03-02-2023
Signature                                         Date

 **Gmail**

Apryl Marie Fogel <aprylmarie@gmail.com>

## Cause of Termination

**Crouch, Linda** <LCrouch@nrahq.org>                                    Tue, Sep 19, 2023 at 12:13 PM
To: Apryl Marie Fogel <aprylmarie@gmail.com>

Apryl Marie,
All employment with NRA is at-will, as stated in your new hire letter:
        "The NRA believes that "at-will" employment serves the best interest of the employee and the NRA.  Accordingly, the NRA practices "at-will" employment in which either the employee or the NRA may terminate the employment relationship at any time and        for any reason. "
Linda
-----Original Message-----
From: Apryl Marie Fogel <aprylmarie@gmail.com>
Sent: Tuesday, September 19, 2023 12:59 PM
To: Crouch, Linda <LCrouch@nrahq.org>
Subject: Cause of Termination

Linda,

Can you please give me the cause of my termination?

Apryl Marie

 Apryl Marie Fogel <aprylmarie@gmail.com>

## Hiring Paperwork Question
2 messages

**Apryl Marie Fogel** <aprylmarie@gmail.com>                        Mon, Oct 16, 2023 at 2:46 PM
To: "Crouch, Linda" <LCrouch@nrahq.org>

Linda,

Would you happen to know why my hiring paperwork indicates that my supervisor was Milissa Coder rather than Tyler Schropp?

Apryl Marie

**Crouch, Linda** <LCrouch@nrahq.org>                        Mon, Oct 16, 2023 at 3:51 PM
To: Apryl Marie Fogel <aprylmarie@gmail.com>

I do not recall

[Quoted text hidden]

**SUMMARY:** The NRA Women's Leadership Forum Director reports directly to the Executive Director of the Office of Advancement and the Co-Chairs of the NRA Women's Leadership Forum (NRA-WLF). The Director provides daily leadership, management and coordination of the NRA-WLF. The Director assists in the development and management of long-term and annual strategic plans and budgets for the NRA-WLF to achieve its goals and objectives. The Director provides on-site leadership and coordinates the NRA-WLF team's efforts to achieve all of its objectives for NRA Annual Meeting. The Director oversees the planning of all NRA-WLF activities and provides analysis of the status and effectiveness of all NRA-WLF activities.

The selected finalist will have an established record of successful fundraising, event management and a network of motivated, high-dollar donors.  Support for the mission of the NRA is essential.

**This position can work from any U.S. location**

**ESSENTIAL RESPONSIBILITIES**:
1. Strengthen relationships with existing donors and identify and cultivate new donors to achieve NRA-WLF's membership and fundraising goals
2. Act with the authority of the Executive Director of Advancement and NRA-WLF volunteer Co-Chairs in accordance with goals, objectives, and policies established by the ED-OOA, the Executive Vice President, the Board of Directors of the NRA and the NRA-WLF Executive Committee. Establish credibility throughout the Association and with internal and volunteer leadership as an effective developer of solutions to the opportunities and challenges of growth facing the NRA-WLF.
3. Working with the NRA-WLF Co-Chairs, assist in the creation of and monitor progress on long-term strategic plans and budgets for the NRA-WLF. Update long-term strategic plans and budgets as appropriate.
4. Lead the development and submission of a budget for the NRA-WLF for the next fiscal year to support the strategic goals and objectives for the program, including revenue projections, costs, and capital expenditures. Monitor and evaluate the current year's NRA-WLF budget to ensure efficient expenditure of fiscal resources and affect timely payment of invoices while insuring operations are within budget guidelines.
5. Serve as lead director for all official NRA-WLF events including the Women's Leadership Forum Luncheon and Auction held in conjunction with the NRA Annual Meeting and the NRA-WLF Fall Summit.
6. Responsible for ensuring that all fundraising goals and attendee goals for NRA-WLF events are met. Work with ED-OOA and NRA-WLF Co-Chairs to set future fundraising goals and long term plans as they pertain to NRA-WLF.
7. Work closely with NRA-WLF Co-Chairs to ensure they have the necessary tools and resources available to them in order to exceed the goals of their national roles.
8. Responsible for overseeing or leading all details of each event including but not limited to: communications (talking points, invitations, eblasts, flyers, corporate promotions, auction catalogs), donor development and recruitment, program development and execution, event details including timing, seating, meals, guest speakers, schedule of events, and event follow up.
9. Supervise and manage all NRA-WLF administrative support personnel.

**EDUCATION, EXPERIENCE, KNOWLEDGE, SKILLS, AND ABILITIES:**

Required:

- A passion for the mission of the NRA.
- Ten years of successful fundraising experience.
- Experience in planning philanthropic events and activities.
- Personal and professional integrity, as well as high standards of excellence.
- BA/BS degree.
- A proven and substantial track record of successfully managing programs, including but not limited to, strategic plan development, budget development and management, human resource management.
- A proven track record as a successful manager and motivator of personnel at all levels of experience and with a variety of responsibilities and duties.
- Ability and experience to discern informational needs of the advancement department, interpret those needs into useful reports, and communicate information and data in an understandable manner to provide needed facts and guidance to the decision making process.
- Working knowledge of charitable giving best practices, tax laws, and regulations.
- Ability to participate in extensive travel nationally.
- Must be able to work in a fast paced environment with minimal supervision.
- Excellent oral, written, presentation, and interpersonal communication skills.
- Assertive.
- Collaborative, committed to team; able to engender trust among superiors, colleagues and donors.

# AFFIDAVIT
## (SWORN STATEMENT)

May 7, 2024

My legal name is Marion P. Hammer ("Affiant") and I acknowledge I am:

- Age: 85
- Residency: Florida

Being duly sworn, hereby swear under oath that:

I have recently been made aware of certain alleged facts and statements attributed to me in a Jackson Lewis document identified as "National Rifle Association - Fogel" and dated March 28, 2024 (hereinafter, the "Fogel Document").

Specifically, the Fogel Document provides in part "Between March and September 2023, Ms. Fogel raised just $1,000.00 for WLF. Even this paltry amount was a token donation Ms. Fogel obtained from an Executive Committee member, Marion Hammer, who served as a quasi-mentor to Ms. Fogel. On or around this time, Ms. Fogel confided in Ms. Hammer that her employment with the NRA "was not going well," or words to that effect."

The above-referenced portion of the Fogel Document is inaccurate, misleading, and false. First and foremost, I have never been interviewed by or given a statement to the NRA or any of its representatives with regard to Apryl Marie Fogel in any manner, much less to anything that Ms. Fogel may or may not have confided in me.

Furthermore, with regard to the total amount of my donation to the NRA Foundation in response to Ms. Fogel's request for contributions, the Fogel Document is inaccurate. In response to Ms. Fogel's fundraising request, I made three separate donations totaling an amount of five thousand dollars ($5,000). I have included a copy of two of my canceled donation checks totaling three thousand five hundred dollars ($3,500.00). A copy of the third check written on August 23rd is not included as it has never cleared my bank. That donation was in the amount of fifteen hundred dollars ($1,500).

Beyond my personal contributions, which Ms. Fogel was the only person to ask me for during my decades at the NRA, Ms. Fogel also secured a written $100,000 pledge to create an endowment in my name. This sizable contribution was set to be paid within weeks of her termination.

In summary, the alleged facts and statements contained in the Fogel Document concerning me, my contributions and her fundraising success are false, have no foundation based in truth, and should be corrected immediately.

Under penalty of perjury, I hereby declare and affirm that the above-mentioned statement is, to the best of my knowledge, true and correct.

Affiant's Signature: _Marion P. Hammer_        Date: _5/13/24_

## NOTARY ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of FLORIDA
County of LEON

On _05/13/2024_ before me, _John Weeks_, personally appeared Marion P. Hammer  who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity, and that by their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of FLORIDA that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____        (Seal)

JOHN WEEKS
Commission # HH 135897
Expires May 31, 2025
Bonded Thru Troy Fain Insurance 800-385-7019



1409

63-9138/2631

TALLAHASSEE, FL 32302

3/22/2023 Date

PAY to the order of _NRA FOUNDATION_    $ 2,500.00/100

_Two Thousand & Five Hundred & No/100_ Dollars

BB&T

BRANCH BANKING AND TRUST COMPANY
1-800-BANK BBT  BBT.com

For WOMEN'S Leadership FoRum    Signature

04172023
PNC Indianapolis
3696002372080

PAY TO THE ORDER OF
PNC Bank
054000030
FOR DEPOSIT ONLY
National Rifle Association
53036295111



TALLAHASSEE, FL 32302

1414
63-9138/2631

6-1-2023
*Date*

PAY
to the order of   NRA Foundation                      $ 1,000.⁰⁰/₁₀₀

ONE Thousand & No/₁₀₀                                Dollars

BB&T   BRANCH BANKING AND TRUST COMPANY
1-800-BANK BBT BBT.com

For   Donation For WLF          *Signature*

J514831454 Remote Deposit 06.15.2023 09:40:31

Pay To The Order Of
Atlantic Union Bank & Trust
051403164
For Deposit Only
The NRA Foundation Inc
8525423043